LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.
Hadjar Anahita Ohadi (SBN 358387)
aohadi@rcornishlaw.com
Arthur McDonough (SBN 309695)
amcdonough@rcornishlaw.com
Yilei Huang (SBN 361829)
yhuang@rcornishlaw.com
9800 Wilshire Blvd
Beverly Hills, CA 90212
Tel: (213) 871-7788

*Attorneys for Plaintiffs Trista Yerkich, individually and as beneficiary of the Trista Yerkich IRA, Douglas Omundson, individually and as beneficiary of the Glenn Omundson IRA, William Cukr, beneficiary of the William Cukr Traditional IRA, Maria Carrillo, and Cesar Palomares*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| TRISTA YERKICH, individually and as beneficiary of the Trista Yerkich IRA, DOUGLAS OMUNDSON, individually and as beneficiary of the Glenn Omundson IRA, WILLIAM CUKR, beneficiary of the William Cukr Traditional IRA, MARIA CARRILLO, and CESAR PALOMARES,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO G. SANTARELLI; RONALD A. FOSSUM JR.; MICHAEL JOHNSON; and NORADA FUND MANAGEMENT, LLC,<br><br>Defendants. | Case No. 8:26-cv-00698<br><br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

COME NOW Trista Yerkich, as beneficiary of the Trista Yerkich IRA, Douglas Omundson, individually and as beneficiary of the Glenn Omundson IRA), William Cukr, beneficiary of the William Cukr Traditional IRA, Maria Carrillo, and Cesar Palomares (the "Texas Norada Plaintiffs"), by and through their attorneys, Law Offices of Robert V. Cornish, Jr., P.C., and for their Complaint state and allege as follows:

## PRELIMINARY STATEMENT

1. This action arises from securities frauds and corporate misconduct perpetrated through a Ponzi scheme (the "Norada Enterprise"). The Norada Enterprise gathered at least $60 million by way of the illegal placement, sale and solicitation of debt securities of Norada Capital Management, LLC ("Norada Capital") (the "Notes"). From at least June 2020 through 2024, the Notes were peddled to prospective investors to provide returns of 12% -17% annually, and in some cases additional "bonus" payments of 5%. These profits were to have been derived from investments made by and through commonly managed companies under the umbrella of Norada Capital (the "Norada Entities").

2. Included among the Norada Entities were Norada Equity, Norada Ecommerce, Norada Crypto, Norada Theatrical, Norada Real Estate Funding, and Norada Capital Real Estate, each a Wyoming corporate entity represented to be safely under the umbrella of Norada Capital.

3. The Texas Norada Plaintiffs and dozens of others reasonably believed this story. The Texas Norada Plaintiffs believed that their money would be allocated into diversified, income-producing real estate ventures, intellectual property platforms, e-commerce operations, and related profitable businesses that would generate sufficient cash flow to service interest payments and return principal.

4. In reality, the Notes were debt in a Ponzi-like enterprise in which: (a) investor funds were commingled across the Norada Entities; (b) returns to earlier investors were paid using funds obtained from newer investors; (c) the Norada

Enterprise was always insolvent and operating at significant cash-flow deficits; (d) Defendants, while associated with the Norada Enterprise, concealed material regulatory sanctions, bankruptcies, and financial instability; (e) the offering was not eligible for the claimed Regulation D exemption thus rendering it an illegal public offering; (f) investor funds were diverted into outside ventures unrelated to the Notes; and (g) when the scheme could no longer sustain payments, Defendants suspended or caused the suspension of interest payments and forcibly converted debt into illiquid equity or actively assisted in that conversion.

5. Making matters worse was that some of the base investments ultimately approved by Santarelli for the Texas Norada Plaintiffs and others were in fact Ponzi schemes themselves.

6. Formed in December 2023, Defendant Norada Fund Management purportedly acted as an "asset allocator" or "asset manager" to allocate and manage investments held in the other Norada Entities for the Notes.

7. From offices in Orange County, California, Defendant Marco G. Santarelli ("Santarelli") was the CEO of each one of the Norada Entities.

8. Defendant Ronald A. Fossum Jr. ("Fossum"), despite being classified as a "bad actor" by the United States Securities and Exchange Commission ("SEC") for previous securities law violations, served as the actual or *de facto* Chief Financial Officer of each one of the Norada Entities.

9. Also, from offices in Orange County, California, Defendant Michael Johnson ("Johnson") was designated as the "Senior Investment Counselor" for Norada Capital and, on information and belief, served in similar roles for the other Norada Entities, including "asset allocator" Norada Fund Management from December 2023 onward. Johnson also oversaw the retail marketing of the Notes.

10. On October 20, 2025, the SEC filed an enforcement action in this Court and charged Santarelli with operating a Ponzi-like scheme. SEC Litigation Release No. 26420 (Nov. 19, 2025), https://www.sec.gov/enforcement-litigation/litigation-

releases/lr-26420 (Accessed February 12, 2026); SEC *v. Santarelli,* No. 8:25-cv-02375 (C.D. Cal. filed Oct. 20, 2025). Santarelli consented to the entry of judgment, admitting violations of various federal securities laws.

11. In parallel criminal proceedings later brought by the United States Attorney's Office for the Central District of California, Santarelli pled guilty to wire fraud arising from the same conduct.

12. This despicable Ponzi scheme perpetrated through the Norada Enterprise was directed, managed, and executed by parties in Orange County California and from December 2023 onward in whole or part, through its affiliated "asset allocator" in Orange County, California. This action seeks to hold these parties civilly liable for their active roles in the Norada Enterprise.

13. The Texas Norada Plaintiffs invested $950,000 (NINE HUNDRED FIFTY THOUSAND DOLLARS) in the aggregate in the Notes. They seek recovery of those funds through this action.

## PARTIES

14. The Texas Norada Plaintiffs are as follows:

a. Plaintiff Trista Yerkich and Trista Yerkich as beneficiary of the Trista Yerkich IRA is an individual residing in Allen, Texas.

b. Plaintiff Douglas Omundson is an individual residing in North Fort Worth Texas. Omundson is also the beneficiary of the Glenn Omundson IRA.

c. Plaintiff William Cukr, beneficiary of the William Cukr Traditional IRA is an individual residing in Lewisville, Texas.

d. Plaintiffs Maria Carrillo and Cesar Palomares are individuals residing in Arleta, Texas.

## INDIVIDUAL DEFENDANTS

15. Santarelli is an individual who resides in Laguna Niguel, California. Santarelli is a licensed real estate broker in the State of California (License ID

#01782514) and was an on-line personality that promoted real estate investments. At all relevant times, Santarelli was an officer and controlling person of each of the Norada Entities. At all relevant times, Santarelli exercised substantial authority over financial reporting, accounting, investor payment administration, and internal controls over each of the Norada Entities, including authorizing or directing intercompany transfers and the commingling of investor proceeds.

16. On information and belief, Fossum now resides in Seattle, Washington. Defendant Fossum was formerly registered with the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer (CRD #3194203) until SEC civil and regulatory sanctions were entered against him on or about December 19, 2017 and June 17, 2018, respectively. Fossum was permanently barred by the SEC from association with any broker, dealer, or investment adviser and from participating in the issuance, purchase, offer, or sale of any security other than for his personal account. At all relevant times, Fossum served as CFO of Norada Capital and exercised substantial authority over financial reporting, accounting, investor payment administration, and internal controls across the Norada Entities as their *de facto* CFO, including authorizing or directing intercompany transfers and the commingling of investor proceeds.

17. On information and belief, Michael Johnson ("Johnson") resides in San Diego, California. At all relevant times, Johnson served as the "Senior Investment Counselor" at Norada Capital and from December 2023 onward, also at Norada Fund Management.

18. Santarelli, Fossum and Johnson together are the "Individual Defendants."

19. Defendant Norada Fund Management, LLC ("NFM") is a non-resident limited liability company authorized to conduct business in California, and shares the same California office address in Laguna Niguel, California with the other Norada Entities. Formed in December 2023, NFM purportedly served as an "asset

allocator" or "asset manager" of Norada Capital and exercised operational control over investor funds and financial decisions of the Norada Entities and thus the Norada Enterprise from December 2023 onward.

20. At all relevant times, Santarelli dominated and controlled the Norada Entities such that their separate corporate personalities did not in reality exist.

21. The Norada Enterprise operated as a single enterprise and shared common ownership, management, offices, personnel, marketing channels, and bank/payment infrastructure, and were used interchangeably as conduits for investor funds represented to investors to be deployed into investments supporting the Notes.

22. Instead, investor proceeds were commingled among the entities, transferred without arms-length documentation or reasonably equivalent value, and used to fund operations and expenditures without regard to corporate separateness.

23. The Norada Entities were inadequately capitalized relative to the obligations undertaken to the Texas Norada Plaintiffs, and the structure was used to conceal insolvency, hinder creditor recovery, and perpetuate the scheme described herein.

24. Recognizing the corporate separateness of the Norada Entities would promote injustice because Defendants used the entity structure to raise investor funds, distribute misleading materials, and shield Santarelli from liability while he exercised dominion and control.

25. The Norada Entities failed to observe corporate formalities, lacked independent boards or governance, shared common bank accounts and accounting personnel, commingled funds without documentation, and functioned as instrumentalities of Santarelli.

## JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because the Texas Norada Plaintiffs assert claims arising under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C.

§§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

27. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Texas Norada Plaintiffs' related state-law claims because those claims arise from the same nucleus of operative facts as the federal securities claims, including the solicitation, issuance, marketing, and administration of the promissory notes at issue and the subsequent suspension, conversion, and nonpayment of amounts owed to the Texas Norada Plaintiffs.

28. This Court has personal jurisdiction over Defendants Santarelli and Johnson because they reside in California and committed the wrongful acts alleged herein in California, including the creation and dissemination of marketing materials, investor decks, webinars, and investor communications originating from California; the receipt, commingling, and deployment of investor funds from California; and the decision to suspend note payments and impose a forced debt-to-equity conversion from California.

29. This Court has personal jurisdiction over Defendant Fossum because, on information and belief, he purposefully directed and participated in a nationwide securities offering administered and controlled from California, served as Chief Financial Officer of Norada Capital in connection with the Notes offering, exercised substantial influence over financial reporting and investor payment administration that was routed through California-based operations, and knew or should have known that the effects of his conduct would be felt by investors in California and nationwide. Fossum's actions constitute purposeful availment and purposeful direction toward this forum.

30. This Court has personal jurisdiction over NFM because from December 2023 onward, it is authorized to conduct business in California, conducted continuous and systematic business operations within this District, directed the offer and sale of the Notes from this District, administered investor funds in this District, and actively assisted in the challenged debt-to-equity conversion in this District.

31. To the extent not otherwise provided, jurisdiction of this Court over each Defendant may be invoked through California's long-arm statute.

32. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa because a substantial part of the events and omissions giving rise to the claims occurred in this District. Santarelli resides in this District and the SEC's enforcement action against Santarelli was filed in this District.

33. Plaintiffs previously filed a related action in the United States District Court for the District of Wyoming concerning overlapping operative facts relating to the Norada Enterprise and the unlawful sale of promissory notes (the "Wyoming Action").

34. The Wyoming Action now primarily asserts claims arising under Wyoming law and other applicable securities laws only against those Norada Entities incorporated in Wyoming.

35. This action is not duplicative of the Wyoming Action. Wyoming has no implied consent rule for assertion of jurisdiction over officers of Wyoming corporations, such as the Individual Defendants. Thus, this Complaint includes: (a) claims against the Individual Defendants; (b) claims tied to the business conduct of the Individual Defendants; (c) and claims involving the only one of the Norada Entities not incorporated in Wyoming. To the extent there is any overlap, the claims asserted herein are included to establish the predicate violations necessary to impose liability upon each of the Defendants while they were associated with the Norada Enterprise under, *inter alia,* Section 20(a) of the Securities Exchange Act, Texas control-person liability under its securities laws, California's alter-ego doctrines and other related common-law doctrines.

36. Plaintiffs do not seek duplicative recovery. Any recovery obtained in the Wyoming Action shall be credited against any recovery obtained in this action to the extent required by law. To the extent any overlap exists, Plaintiffs seek

complementary, not duplicative, remedies arising from California-based conduct and additional defendants not present in the Wyoming Action.

## BACKGROUND ON NORADA CAPITAL

37. Santarelli, Johnson and NFM are each unregistered as brokers, dealers, or investment advisers under both federal law and the laws of Texas. Santarelli, and Johnson were in the business of sponsoring, marketing, and managing an unregistered public securities offering in the Notes. According to Norada Capital, its role is to provide investors with "promissory note investments that generate predictably monthly income" so investors "don't have to chase the volatility and unpredictable returns offered by the stock market."

38. Instead, Santarelli, with the active and purposeful assistance of Fossum and Johnson, created the Notes and the other Norada Entities to concoct and manage a Ponzi scheme paying purported "returns" to investors using new investor money, while concealing insolvency, misusing proceeds, and diverting investor funds to affiliated entities and outside ventures—all the while coopting the Norada Entities as instrumentalities to waste or misappropriate investor funds.

39. Norada Capital served as the front company to which the Texas Norada Plaintiffs transferred their funds under the guise of a legitimate investment. From December 2023 onward, NFM and Johnson purportedly allocated investor funds to the other Norada Entities, all of which were portfolio-holding vehicles through which investor funds were supposedly to be deployed to generate returns.

40. On or about November 30, 2020, Defendant Norada Capital filed a Form D with the SEC pursuant to Rule 506(c) of Regulation D of the Securities Act of 1933. Under Regulation D of the 1933 Act and parallel Texas laws and regulations, companies are permitted to offer and sell securities without SEC registration required of public companies provided that certain conditions are met, including the absence of any disqualifying "bad actors" and the issuer's compliance with disclosure and anti-fraud requirements.

41. At all relevant times, Norada Capital's investor-facing materials identified Fossum as CFO and presented him as a senior financial executive responsible for financial oversight. Fossum's background constituted a disqualifying "bad actor" event under Rule 506(d) of the 1933 Act, rendering Norada Capital ineligible to rely on any Rule 506(c) private offering exemption absent a valid waiver or exception.

42. Fossum is a former investment fund manager who was convicted on or about June 17, 2018, of "misappropriating hundreds of thousands of dollars of investor funds he raised through unregistered securities offerings of three investment funds he owned and controlled." *SEC v. Ronald A. Fossum, Jr. and Alonzo R. Cahoon,* No. 2:17-cv-01894 (W.D. Wash., Filed Dec. 19, 2017).

43. As a result of Fossum's conviction, the SEC indefinitely barred him from acting as a broker or investment advisor or otherwise associating with firms that sell securities or provide investment advice to the public and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal account. *Id.*

44. Fossum's prior conviction and permanent bar by the SEC render him a "bad actor" per the applicable SEC regulations and parallel regulations in Texas, constituting a disqualifying event under Rule 506(d) of the 1933 Act. Therefore, Norada Capital was prohibited from claiming a Regulation D exemption because the presence of a disqualified individual triggered the "bad actor" disqualification under Rule 506(d) of the 1933 Act.

45. Disclosure of Fossum's status was material to any reasonable investor in the Notes and material to the legality of the claimed exemption. Fossum's status as a "bad actor" was never disclosed to the Texas Norada Plaintiffs, and it certainly was material information upon which a reasonable investor would consider important in making an investment decision. It certainly was not disclosed to the SEC.

46. Santarelli personally signed and certified the accuracy of Norada Capital's Form D filing, falsely verifying to the SEC that no exceptions or disqualifications applied. Given that Fossum is a "bad actor" pursuant to Rule 506(d) of Regulation D of the 1933 Act, Santarelli's attestations that Norada Capital or any of the Norada Enterprise Defendants were eligible to claim a Regulation D exemption from registration were materially false and misleading. Thus, any claims that Defendants may make regarding the reliance of Norada Capital on private securities offering exemptions either federally or under Texas law while those Defendants were associated with the Norada Enterprise, are materially false and misleading as a matter of law.

47. Other material facts regarding individuals involved in the Norada Enterprise were never disclosed properly. In 2007, Santarelli's former company, 360 Enterprises d/b/a Norada Real Estate, filed for bankruptcy in the U.S. Bankruptcy Court, Central District of California. *See In re 360 Enterprises*, Petition Number 8:07-bk-12868-RK. This fact was never caused to be disclosed by Defendants while they were associated with the Norada Enterprise to the Texas Norada Plaintiffs in the placement of the Notes and continued holding of the Notes.

48. In addition, in 2008, Santarelli filed for bankruptcy in the U.S. Bankruptcy Court, Central District of California, and had his debts discharged. *See In re Marco Santarelli,* Petition Number 8:08-bk-13931-RK. This fact was never caused to be disclosed by Defendants while they were associated with the Norada Enterprise to the Texas Norada Plaintiffs in the placement of the Notes and continued holding of the Notes.

49. Further, in June 2011, the Pennsylvania Securities Commission issued a Cease-and-Desist Order, finding Santarelli violated Pennsylvania state securities laws by offering unregistered securities to a non-accredited investor and failing to disclose his bankruptcy filing and debt discharge as well as 360 Enterprises d/b/a Norada Real Estate's bankruptcy filing.

50. As a result of this conduct in Pennsylvania, on June 13, 2012, the California Department of Corporations also issued a Cease-and-Desist Order against Santarelli, Cash Flow Management, LLC, and Cash Flow Energy Fund, LLC, ordering they refrain from the further offer or sale of securities in California, unless and until qualification was made under California law or unless exempt.

51. While employed or associated with the Norada Enterprise, none of the Defendants disclosed any of these events to the Texas Norada Plaintiffs before or after soliciting or accepting their investments and did not disclose these matters to them in the investor deck, marketing materials, or updates distributed to the Texas Norada Plaintiffs following the purchases of the Notes.

## THE NOTES SCAM BEGINS

52. While associated with the Norada Enterprise, Defendants authorized, utilized, or caused others to utilize false and misleading marketing materials and social media spots regarding the Notes to which the Texas Norada Plaintiffs referred to or had access in connection with their purchases and continued holding of the Notes. These materials included a publicly accessible website, mass-distributed marketing flyers, investor decks, email campaigns, podcasts, video content, and recurring webinars containing material misrepresentations and omissions to perpetuate its Ponzi scheme.

53. While associated with the Norada Enterprise, Defendants each affirmatively knew those material misrepresentations and omissions were false and misleading when made or failed to be made, and knew that the Texas Norada Plaintiffs and others did not realize the risky and highly speculative nature of the investments allocated to the other Norada Entities by Santarelli, Johnson and NFM doomed any reasonable prospects to ever get their money back.

54. From at least as early as May 2021 through January 2024, Defendants Santarelli, Fossum, and Johnson began distributing or caused to distribute to the Texas Norada Plaintiffs and others marketing materials offering "predictable income

with promissory notes" and "monthly passive income with interest of 15% or more" (the "Notes").

55. In order to induce each of the Texas Norada Plaintiffs to invest or make additional investments in the Notes, Defendants falsely represented or caused others to falsely represent to the Texas Norada Plaintiffs that the investment objectives for the Notes were to provide "rates of return that are higher than banks, traditional low yield bonds, and higher than most stock dividends."

56. While employed or associated with the Norada Enterprise, Defendants also offered or caused to offer the Notes to the Texas Norada Plaintiffs to "use their self-directed traditional IRA or Roth IRA. We can recommend several custodian companies that handle the paperwork and hold your IRA while the funds are invested with us." *See* ***Exhibit "1"*** ("Predictable Income with Promissory Notes") and ***Exhibit "2"*** ("Norada Capital Fund Predictable Passive Income with Promissory Notes") (collectively, the "Marketing Materials").

57. In frequently posted videos on YouTube, Santarelli repeatedly spoke on behalf of Norada Real Estate to falsely imply the safety of supposed real estate investments that would generate income for the Notes. [1]

58. Investors in the Notes, such as the Texas Norada Plaintiffs, were offered terms ranging from 3-7 years, a 12% - 17% interest rate depending on the principal amount invested, and a possible 5% "bonus rate" if $200,000.00 or more was invested. Marketing materials for the Notes informed the Texas Norada Plaintiffs and others that Norada Capital sought "stable and high-income opportunities with capital preservation. A second objective is to take advantage of opportunities with good capital appreciation potential."

---

[1] Norada Real Estate Investments, *How to Earn 15% Interest and Beat Inflation with Promissory Notes (Norada Capital Management)*, YOUTUBE (Jan. 20, 2023), https://www.youtube.com/watch?v=XZvLUd7qMPk




59. These representations were false when made or caused to be made by Defendants while associated with the Norada Enterprise. The purported portfolio companies held in the Norada Entities to which funds were allocated by Santarelli, Johnson or NFM did not generate the cash flow required to service the promised interest rates. Thus, Norada Capital lacked sufficient legitimate operating income to make the promised payments to investors in the Notes.

60. Several of Norada Capital's flyers provided to the Texas Norada Plaintiffs and relied upon by them in decisions to purchase or hold the Notes also stated and restated that current holdings underlying the Notes fell into three categories and listed various company names as follows:

a) E-Commerce Business

i. Pier 1

ii. Linens n Things

iii. Ralph & Russo

iv. Dressbarn

v. Stein Mart

vi. Roland Mouret

vii. Modell's Sporting Goods

viii. Bodybuilding.com

ix. The Franklin Mint

x. Farmerscart

xi. MentorBox

b) Real Estate and Other Businesses

i. BRD Land & Investment

ii. Imagination Vacation Rentals

c) Media Businesses

i. InPickleball Media

d) Theatrical Businesses

e) Crypto Assets

i. Bitcoin

ii. Solana

This flyer is annexed hereto and incorporated by reference to this Complaint as ***Exhibit "1," supra.***

61. Several marketing publications utilized in communications with the Texas Norada Plaintiffs and others from at least August 2022 through January 2024 reviewed, edited, approved and caused to be distributed by Defendants while associated with the Norada Enterprise, advertised that 55.3% of the asset allocation of Norada Capital's current holdings once classified as real estate investment were actually in so-called "Mastermind Businesses," including Aspire, Money is, and Level Up, the securities of which were allocated to one or more of the Norada Enterprises. On information and belief, these component businesses were controlled by non-party Aspire Events.

62. Aspire Events' manager was Collective Equity, whose officers and directors are non-parties Andrew Cordle ("Cordle") and Eddie Wilson ("Wilson") were represented or caused to be represented to actual and prospective investors in the Notes by Santarelli, Fossum and Johnson as senior advisors to Santarelli and

Norada Capital.

63. On information and belief, between 2022 - 2024, Cordle and Wilson repeatedly confronted Santarelli regarding the use of their names in marketing materials for the Notes, as they denied serving as advisors to Norada Capital as represented to the Texas Norada Plaintiffs and other investors.

64. That Cordle and Wilson were not advisors to Norada Capital was never disclosed to the Texas Norada Plaintiffs by anyone. Instead, the marketing and update materials that were distributed or caused to be distributed by Defendants while associated with the Norada Enterprise to investors such as the Texas Norada Plaintiffs continued to represent Cordle and Wilson as senior advisors. Dependent upon Santarelli directing funds of Norada Capital to fund their venture (which on information and belief invested in at least one Ponzi scheme itself), it appears that Cordle and Wilson either acceded to these representations or did nothing further to stop them. As late as November 2023 in a webinar with Santarelli, Wilson confirmed that Norada Capital invested in at least some of the Mastermind entities and Norada Capital owned 1/3 of Money Is.[2]

65. In the above-referenced marketing materials for the Notes distributed or caused to be distributed by Defendants while associated with the Norada Entities were the following cash flow projections for these underlying investments intended to induce the purchase of Notes or continued holding of Notes:

[2] Norada Real Estate Investments, Mastermind Business with Eddie Wilson, CEO of Aspire | Norada Masterclass 11.17.23, YOUTUBE (Nov. 22, 2023), https://www.youtube.com/watch?v=tT1BzdDbdSc&t=1171s.

# CASH FLOW PROJECTIONS

Four-year cash flow projections based on current asset allocation and distribution projections:

| | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|
| Gross Revenues | $23,882,800 | $36,882,800 | $38,122,800 | $44,562,800 |
| Interest Expenses | -$9,615,000 | -$7,515,000 | -$4,215,000 | -$465,000 |
| Operating Expenses | -$450,000 | -$300,000 | -$300,000 | -$300,000 |
| Note Surplus / Payoffs | $8,000,000 | -$8,000,000 | -$16,000,000 | -$22,000,000 |
| | | | | |
| **NET CASH FLOW:** | **$21,817,800** | **$21,067,800** | **$17,607,800** | **$21,797,800** |

Updated January 1, 2024

Statements made herein includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 which represent our expectations or beliefs concerning future events that involve risks and uncertainties, including those associated with our ability to obtain financing for our current and future operations. All statements other than statements of historical facts included in this presentation including are forward-looking statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we cannot assure you that such expectations will prove to have been correct. You should always consult your own independent tax or legal professionals or advisors prior to making any investment, including this one. Important factors that could cause actual results to differ materially from our expectations ("Risk Factors") are disclosed in a Private Placement Memorandum, including without limitation, in connection with the forward-looking statements included in the Memorandum. All subsequent written and oral forward-looking statements attributable to us or persons acting on its behalf are expressly qualified in their entirety by the Risk Factors.

66. On information and belief, these "revenue projections" were never founded on commercially reasonable or even legitimate financial data of "thriving companies" in the "fund's portfolio," and were known by the Defendants, as such. Defendants while associated with the Norada Enterprise intentionally failed to disclose their masquerade of profitability of component investments in order to maintain the Ponzi scheme. While associated with the Norada Enterprise, Defendants knew or had reason to know that had they facilitated financial projections that were commercially reasonable or accurate instead of the fake ones they provided to the Texas Norada Plaintiffs and others, and that the rates of return would likely be minimal or negative and the Norada Enterprise would therefore be revealed.

67. On information and belief, these "revenue projections" were known at each instance they were distributed to the Texas Norada Plaintiffs and others to be inaccurate by the Defendants while they were associated with the Norada Enterprise also because they knowingly hired an inexperienced bookkeeper nearly 3,000 miles away in Long Island, New York, to maintain their financial records. Santarelli and Fossum intentionally hired an inexperienced bookkeeper to provide plausible

deniability for the commercially unreasonable projections they orchestrated to keep the Norada Enterprise afloat.

68. Santarelli, Fossum and Johnson distributed or caused to distribute fake balance sheets to then current and prospective investors, including the Texas Norada Plaintiffs, in May 2023 that falsely claimed the Mastermind Businesses had total assets of $113.4 million. While associated with the Norada Enterprise, each of the Defendants knew or had reason to know that these balance sheets were inaccurate and thus false and misleading each time they were distributed or caused to be distributed to the Texas Norada Plaintiffs and did nothing to disclose these material facts.

69. Senior Advisors Cordle and Wilson also knew about the false valuations of the Norada Entities' holdings in the Mastermind Businesses by virtue of their insider status as to their own companies. Both Cordle and Wilson knew or had reason to know that not even the entirety of the holdings of the Norada Entities in Mastermind Businesses were worth $113.4 million, let alone a small portion of them, given their own difficulties in fundraising.

70. The purpose of the false and misleading information regarding Aspire as communicated to then-current and prospective investors in the Notes such as the Texas Norada Plaintiffs was to suppress potential redemptions so that more assets could be gathered from new and existing investors, to continue illicit Ponzi activities and, as to Santarelli, fund extravagant personal spending.

71. At all relevant times while associated with the Norada Enterprise, Defendants failed to warn or disclose to investors, including the Texas Norada Plaintiffs, Santarelli's prior business failures, bankruptcy filings, debt discharge, prior findings that he violated state securities laws in his previous investment ventures and other business irregularities to which they were privy.

72. Each of these failures by Defendants while associated with the Norada Enterprise to disclose such information were intentional, as revealing Santarelli's

past questionable conduct would have shattered his on-line persona as an investment savant worthy of entrustment of tens of millions of dollars for investment. In fact, virtually all the "theatrical investments" touted by Santarelli that were used to lure the Texas Norada Plaintiffs and other investors to purchase Notes were undocumented, nominal and meaningless in light of the Ponzi scheme of the Norada Enterprise.

73. While associated with the Norada Enterprise, Defendants also represented or caused to represent to the Texas Norada Plaintiffs and other investors in marketing materials and client updates that an investor's principal "is automatically returned to [his/her] funding account upon the maturity of [his/her] Note. [Investor has] the option to reinvest your principal if additional investment opportunities are available at that time."

74. These statements were false when made to the Texas Norada Plaintiffs and known to be false by Defendants, given that each of them knew or had reason to know that the Norada Entities in fact did not maintain segregated "accounts" such as "funding accounts" for the return of capital. This is because no capital of investors in the Notes (if it in fact was invested) could ever be lawfully returned to them because the underlying companies were not generating profit and whatever investors' money was left was commingled among the Norada Entities and used for the fraudulent Norada Enterprise.

75. In marketing materials, the passive, hassle-free nature of investment in the Notes was emphasized in that "[O]ur notes are ideal for passive investors seeking to add and diversify their income streams. Interest payments are deposited monthly via ACH, making it a truly hands-off passive investment." *See* ***Exhibit "2,"*** *supra.* While associated with the Norada Enterprise, each of the Defendants knew or had reason to know that these statements were false when made because each of them knew or had reason to know that the Notes were not ideal or suitable for any investor whatsoever. This is because each of the Defendants knew or had reason to know of

the conduct of Ponzi activities and the relative worthlessness of the component holdings held by the Norada Entities that were to provide the investment returns for the Notes.

76. While associated with the Norada Enterprise, Defendants assisted one another in the gathering of millions of dollars from dozens of investors through the aforementioned numerous false and misleading statements in the marketing materials for the Notes, all supported by a "boiler room" like sales staff managed by Johnson under Santarelli's supervision that could conveniently feign ignorance to the fraudulent Norada Enterprise. Under Fossum's watch, investor capital intended for the component investments of Notes was instead diverted elsewhere in contravention of any modicum of corporate controls and funded, among other things, compulsive spending by Santarelli in consumer goods and other non-investment activities, which on information and belief exceeded 4,000 transactions per month—or one transaction every 12 minutes of each day—on at least one credit card.

77. Crucial to the conduct of the Norada Enterprise was the "investor deck" for the Notes. While associated with the Norada Enterprise, Defendants caused to distribute and approved the distribution of the deck from at least September 2022 through February 2024. The Texas Norada Plaintiffs relied upon the deck or were provided access to it in connection with the sale and continued holding of their respective Notes.

78. First and foremost, the "investor deck" failed to adequately disclose Fossum's disqualifying history, and thus the registration status of the Notes being in violation of the state and federal laws. These omissions induced potential investors to believe that the Defendant Norada Capital's management had no "bad actors" under Rule 506(c) of Regulation D of the 1933 Act. Moreover, the "investor deck" contained false, fabricated, and misleading statements regarding the profitability of the Notes, the financial success of the underlying companies under Santarelli's control and the stability of the "portfolio," all of which induced the Texas Norada

Plaintiffs to purchase or continue holding the Notes.

79. These false and misleading statements, all of which were reviewed, edited, approved and caused to be distributed by the Defendants during the times in which they were associated with the Norada Enterprise include, but are not limited to the following statements:

A. *"Norada Capital provides investors with promissory note investments that generate predictable monthly income and double-digit returns from 12% to 15%."*

This statement was false when Defendants caused it to be made by Norada Capital to the Texas Norada Plaintiffs because the Notes were not generating these returns, they knew they were not generating such returns and had no reasonable expectation of ever generating such returns, given the lack of internal controls and misuse of investors' funds. The intent of this statement was to deceive and mislead the Texas Norada Plaintiffs and other investors into believing that the Norada Entities were prosperous and worthy of investment, when in fact no reasonable investor would ever invest anything in any of them had the truth been disclosed.

*B. "Our fund's portfolio is made up of viable business assets that we work to grow and scale. Our notes are ideal for passive investors seeking to add and diversity their income streams. Interest payments are deposited monthly via ACH, making it a truly hands-off passive investment."*

This statement was false when Defendants caused it to be made by Norada Capital to the Texas Norada Plaintiffs and others because the underlying companies were not viable, not growing, not scalable and had no income stream that could possibly pay the interest rates promised. Further, there was in fact no "interest" to be deposited monthly, as any such funds classified as "interest" were in fact Ponzi-type payment proceeds. The intent of this statement was to deceive and mislead investors such as the Texas Norada Plaintiffs into believing that the Norada Entities were a prosperous group of companies venture worthy of investment when in fact no reasonable investor would ever invest had the truth of their underlying affairs been disclosed.

80. While associated with the Norada Enterprise, each of the Defendants induced the Texas Norada Plaintiffs to purchase or continue holding Notes by making the following misrepresentations about the opportunity to invest in the Notes:

A. HIGH GROWTH—We underwrite portfolio assets with high capital growth potential as the firm retains those gains on its balance sheet as a private equity firm.

B. HIGH CASH FLOW— We underwrite portfolio assets with high cash-flow or future cash-flow potential.

C. CAPITAL PRESERVATION- We underwrite portfolio assets with strong capital preservation potential.

Slide Deck, Investment Summary, p. 4.

81. While associated with the Norada Enterprise, each of the Defendants knew or had reason to know that there were no gains on the component investments for the Notes to retain. No reasonable financial analyst would consider such assets as having any potential for any growth that would support the returns promised by the Notes.

82. No reasonable financial analyst would consider the underlying component assets of the Notes as having the potential for high cash flow, or any meaningful cashflow whatsoever.

83. "Strong capital preservation potential" was misleading when made, as the assets themselves were speculative and did not have potential for capital preservation. Further, the term "capital preservation" is a term of art for the use of fixed income instruments to forgo market returns. Its use here was misleading as it implied that the Notes shared the safety and suitability of investment-grade fixed income securities.

**TRANSFERS TO NON-NORADA ENTITIES AND DOWNSTREAM CONCEALMENT**

84. On information and belief, Ponzi proceeds derived from the illegal placement of the Notes were transferred out of the Norada Entities and invested into Non-party Aspire Events and/or ventures managed by Non-party Collective Equity.

85. Aspire Events invested into REV Holdings, which later became the subject of SEC litigation in the United States District Court for the Southern District of Florida, a fact that underscores the speculative and high-risk nature of investments authorized and facilitated by Defendants while associated with the Norada Enterprise and the compounding of investor risk in what was purportedly a safe investment.

86. On information and belief, Collective Equity acted as manager of Aspire Events and facilitated, received, controlled, and/or deployed investor proceeds transferred from the Norada Entities.

87. On information and belief, Cordle and Wilson—each held out in marketing materials for the Notes as senior advisors of Norada Capital—benefitted from and/or participated in transactions in which investor funds were directed into ventures associated with them, thereby supporting the offering's continuity and the concealment of insolvency.

88. Non-party Themed Str Capital Fund, LLC is a separate venture for which Santarelli filed a Form D in January 2024 for a purported $50 million offering, and on information and belief, investor funds intended for the Notes were instead invested in or otherwise used to support Themed Str.

89. While associated with the Norada Enterprise, Defendants made or caused to make above transfers without reasonably equivalent value to the Norada Enterprise at a time when the Norada Enterprise was insolvent or became insolvent as a result of such transfers, and with the effect and intent of placing assets beyond the reach of creditors, including investors in the Notes such as the Texas Norada

Plaintiffs.

90. Plaintiffs expressly reserve the right to pursue additional claims against the Non-Norada Transferee Defendants, including but not limited to fraudulent transfers, constructive fraudulent transfers, aiding and abetting, unjust enrichment, and related statutory claims, in the United States District Court for the Middle District of Florida or any other appropriate jurisdiction.

## THE INVESTMENTS

91. In justifiable reliance upon the misrepresentations and misinformation provided through Norada Capital by Defendants to Plaintiff Trista Yerkich on November 1, 2023, Yerkich purchased a Note. This Note bore the following terms:

- $80,000.00 principal amount;
- 15% per year annum interest;
- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note on or before the Maturity Date

92. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided through Norada Capital by Defendants to Plaintiff Yerkich on November 1, 2023, Yerkich purchased a second Note. This Note bore the following terms:

- $120,000.00 principal amount;
- 15% per year annum interest;
- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note on or before the Maturity Date

93. In justifiable reliance upon the aforementioned misrepresentations and misinformation provided on behalf of Norada Capital to Glenn Omundson, on February 7, 2024, Glenn Omundson, purchased a Note. Omundson's Note had the following terms:

- $300,000 principal amount;
- 15% per year annum interest;
- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note

on or before the Maturity Date.

94. Glenn Omundson later passed away in May 2024, and the Note was transferred to Plaintiff Douglas Omundson.

95. In justifiable reliance upon the misrepresentations and misinformation provided on behalf of Norada Capital to Omundson by the Defendants, Norada Capital, and Santarelli, Plaintiff Omundson purchased an additional Note through a Traditional IRA for $200,000.00 also on February 7, 2024. This Note had a 5-year maturity date, carried 15% interest per annum, and also came with the 5% "bonus" payment.

96. In justifiable reliance upon the misrepresentations and misinformation provided through Norada Capital by Defendants to Plaintiff William Cukr, beneficiary of the William Cukr Traditional IRA, on April 1, 2024, Cukr purchased a Note. The Note bore the following terms:

- $200,000.00 principal amount;
- 15% per year annum interest;
- 3-year maturity date; and
- "Bonus" payment equal to 5% of the principal amount remaining on the Note on or before the Maturity Date

97. 91. In justifiable reliance upon the misrepresentations and misinformation provided through Norada Capital by Defendants to Plaintiff Maria Carrillo and Cesar Palomares on April 1, 2024, Maria Carrillo and Cesar Palomares purchased a Note. The Note bore the following terms:

- $50,000.00 principal amount;

- 12% per year annum interest; and
- 2-year maturity date.

## FAILURES TO DISCLOSE

98. From at least October 5, 2022 through June 19, 2024 while associated with the Norada Enterprise, each of the Defendants either failed to disclose or caused failures to disclose to its current and prospective investors, including but not limited to the Texas Norada Plaintiffs, that Norada Capital was a Ponzi scheme, that financial information regarding component investments was known by principals and control persons of the Norada Enterprise to be false or misleading, and that there was insufficient income and returns to pay the interest that was promised.

99. To this end, Defendants while associated with the Norada Enterprise distributed or caused to distribute fake balance sheets to then-current and prospective investors through May 2024. These balance sheets claimed the Mastermind Businesses had total assets of $113.4 million. Again, Defendants knew that these balance sheets were inaccurate and thus false and misleading each time they were distributed to the Texas Norada Plaintiffs and others.

100. Senior Advisors Cordle and Wilson knew about the precarious financial positions of the Norada Enterprise through, among other things, blatant and repeated misrepresentations by Santarelli to investors in the Notes that he himself was an executive with a personal financial stake in the Mastermind Businesses when in fact he was not.

101. Santarelli also possessed no such financial or executive position, and in fact was admonished by the Mastermind Businesses themselves for such misrepresentations. The purpose of this false and misleading information communicated to then-current and prospective investors in the Notes was to suppress potential redemptions so that more assets could be gathered to continue illicit Ponzi activities of the Norada Enterprise and, as to Santarelli, create the impression that he bore the same risks in the Notes as the Texas Norada Plaintiffs and other investors

while funding extravagant personal spending with money supposedly invested alongside those in the Notes.

102. From at least August 31, 2023 through June 19, 2024, the Defendants while associated with the Norada Enterprise failed to disclose or caused to fail to disclose to current and prospective investors in the Notes that they were components of a Ponzi scheme, that financial information regarding its component investments was known by common principals and controlling persons of the respective Norada Entities to be false or misleading, and that there was insufficient income and returns to pay the interest that was promised in the Notes due to the misuse of funds by Santarelli.

103. In a September 2023 webinar, Defendant Santarelli falsely claimed the Mastermind Businesses—where a majority of Norada Capital's investments were allegedly deployed and represented as controlled by Santarelli —were experiencing a 45% profit margin.[3] On information and belief, Norada Capital at this time had not invested funds in the Mastermind Businesses to the extent stated despite promises to do so.

104. From at least February 7, 2024 through June 19, 2024, Defendants continued to conceal from current and prospective investors in the Notes that the Norada Enterprise was operating as a Ponzi scheme, that financial information regarding component investments of the Notes were known to be false or misleading, and that there was insufficient income and returns to pay the interest and "bonus payments" that were promised to holders of the Notes, and that funds that were purported to be invested in component companies had not been invested to the extent stated, if at all.

105. By the end of February 2024, with little income generated from any investments supposedly made on behalf of holders of the Notes, Defendants needed

---

[3] Marco Interview: Why I Love Investing in Mastermind Businesses, NORADA CAPITAL MANAGEMENT go.noradacapital.com/mastermind (last visited March 2, 2025).

to quickly garner assets from new investors to pay existing interest and bonus payments at the risk of the Ponzi scheme collapsing. In order to gather more funds and prevent withdrawal requests, the lies and misstatements grew exponentially to meet their illicit fundraising objectives. "Bonus payments" clauses were included in virtually every Note sold in furtherance of the Norada Enterprise after March 1, 2024, to lure unsuspecting investors.

106. By June 2024, the Ponzi scheme was on the verge of collapse. But that did not stop the Defendants from undertaking efforts to gather more investments in Notes from unsuspecting investors.

107. From April 23, 2024 through June 19, 2024, Defendants still (a) concealed from its current and prospective investors in the Notes that it was operating as a Ponzi scheme, that (b) financial information regarding component investments under the common control of Santarelli managed by Johnson and NFM were known to be false or misleading, and (c) that there was insufficient income and returns to pay the interest and "bonus payments" that were promised to holders of the Notes.

108. And while Defendants will no doubt seek to use the Private Placement Memorandum (PPM) of Norada Capital as a shield from liability to the Texas Norada Plaintiffs and other investors, it appears that not all investors in the Notes received or had access to the PPM and thus were provided with virtually no risk disclosures at all. The Texas Norada Plaintiffs are aware that other investors did not receive any copy of the PPM prior to investing at all. The lack of uniformity in the delivery of disclosure documents to investors in the Notes was indicative of a common lack of internal control and adherence with securities laws requirements among the Norada Entities.

109. There is also a plethora of common badges of fraud among the Norada Entities. For example, at the time of each of the Texas Norada Plaintiffs' investments, Defendants while associated with the Norada Enterprise failed to

disclose or caused to fail to disclose that to actual or prospective investors in the Notes that Santarelli(a) previously filed for bankruptcy and had his debts discharged in 2008; (b) was previously subject to a cease and desist order from the Pennsylvania Securities Commission in June 2011 for violating Pennsylvania state securities laws by offering unregistered securities to a non-accredited investor and failing to disclose his bankruptcy filing and debt discharge; and (c) his previous company 360 Enterprises d/b/a Norada Real Estate also filed for bankruptcy.

110. Further, operative language of the Texas Norada Plaintiffs' Notes provides that a default occurs when Norada Capital fails to make any payment required under the respective Note and such period of non-payment continued for more than a period ranging from 10-30 calendar days after notice from the Texas Norada Plaintiffs. Paragraph 6 further states that

> If a Default exists, Maker agrees to provide Holder with shares and/or warrants equal to the principal amount of this Promissory Note should there be a default lasting **more than three (3) months from the month of the default**. Maker reserves the right to buy back said shares and/or warrants by paying off (satisfying) the Promissory Note's outstanding principal in full during the term of the Note.

(emphasis added).

111. Norada Capital made some payments on Notes through the First Quarter of 2023 (for those Texas Norada Plaintiffs who then held them) and then sporadically. The payments then completely stopped in June 2024.

112. The misrepresentations and omissions made or caused by Defendants while they were associated with the Norada Enterprise artificially inflated the perceived value and safety of the Notes. When the truth regarding Norada Capital's insolvency, lack of legitimate cash flow, and inability to continue payments was revealed through the suspension of distributions and forced conversion on June 20, 2024, the true value of the Notes was exposed as substantially less than represented if not worthless, causing Plaintiffs' losses.

**THE NOTES SCAM UNRAVELS**

113. On June 13, 2024, Defendants continued their concerted efforts to gather investments in the Notes in a YouTube webinar to which investors were invited. Santarelli, with the approval of Fossum, Johnson and NFM, continued to tout investments in the Notes to others as "well-diversified."[4] These statements when caused to be made Defendants were misleading because while the names of these investments (to the extent money was deployed when not purloined) were diversified, their value was not. They were all distressed and virtually worthless.

114. In the June 13, 2024, YouTube webinar, Santarelli on his own behalf and on behalf of the Norada Enterprise continued to discuss the purported continued success of the Mastermind Businesses—component investments of the Notes—which were in fact not successful to a degree sufficient to support their double-digit interest payments because the full amount of the capital that Santarelli promised to them was never provided.

115. During the June 13, 2024, webinar, one listener asked Santarelli what would happen if Norada Capital converted the Notes to equity and how they would gain interest back. Santarelli responded that such a conversion "is actually to your benefit believe it or not because you actually can and probably will end up making more money by us exercising that option to convert your note into equity and then buying it back later with valuations going up on this . . . ." Santarelli affirmatively stated "None of our businesses are suffering." (emphasis added) "As the Notes mature, we are just going to pay off the Notes." Nothing could have been further from the truth. These statements were false when made and known as much to Santarelli, as he knew or had reason to know that the Ponzi scheme that was the Norada Enterprise was becoming unraveled.

116. For example, on his podcast "Passive Real Estate Investing" for Norada

[4] Ask Marco Anything | Norada Webinar 6.11.24, Norada Capital Management, YOUTUBE, https://www.youtube.com/watch?v=nNSXcXQXucQ (last visited March 2, 2025).

Real Estate June 2024, Santarelli continued to offer and advertise 12-15% interest paid monthly as distributions on the Notes.

117. Yet only one week after this promotional webinar, on June 20, 2024, Santarelli with the approval of the other Defendants emailed each of the Texas Norada Plaintiffs and others stating that distribution payments on the Notes would be suspended and that the Notes would be converted into equity (membership interests) in Norada Capital itself.

118. The e-mail included the following language:

> As with all businesses, Norada is subject to market factors that could impact its ability to make payments. Due to current market conditions and unforeseen financial challenges, we have decided to temporarily suspend distribution payments. This decision was not made lightly and comes after thorough deliberation and analysis of our current financial position.

119. This statement was false and misleading when made, as market conditions had nothing to do with the inability of the Norada Enterprise to cause repayment of the Notes to investors such as the Texas Norada Plaintiffs. The intent of this statement was to lull investors, including but not limited to the Texas Norada Plaintiffs, into believing that the underlying component investments in the various Norada Entities had value when in fact they had little or none to speak of, and that somehow the Notes when converted into equity would be reconverted since the suspension of interest payments was "temporary."

120. The e-mail also stated:

> This *requires us* to exercise our right to convert your Note and issue equity (aka membership interests) in Norada. (emphasis added) You will recall that your Note allows Norada to convert the outstanding balance owed into equity and that it can redeem that equity in the future by repayment of the Note principal in full. There is nothing required by you related to your Note being converted. It happens automatically upon notice being sent.

121. This statement was false when made, as there was no requirement under either state or federal securities law that Norada Capital was obligated to convert its debt obligations to equity.

122. The email continued:

> As such, this email will provide you notice that Norada has chosen to exercise its right under the Note §6 to issue equity to you in Norada. Your equity is valued at the unpaid face value of the Note plus any accrued but unpaid interest. We expect to be in a position to redeem your interests in short order, and we will keep you posted, as always, on any developments in this regard.

123. This statement was false when made because the equity into which the debt obligations were converted were virtually worthless, thus rendering the valuation of equity wholly inaccurate and misleading.

124. The e-mail continued:

> We understand the importance of distributions to our investors and recognize the impact this decision may have on your financial planning. Please be assured that this suspension is temporary. We are committed to resuming regular distributions as soon as our financial situation stabilizes and improves.
>
> Our primary goal is to ensure the long-term stability and sustainability of our business. By temporarily halting distributions, we can preserve capital, manage our resources more effectively, and invest in key areas that will drive future growth and profitability.

125. This statement was misleading when made as there was little or no capital to preserve, no further money to deploy, and that management of its "business" was essentially the inevitable end of a Ponzi scheme. *See **Exhibit "3"*** ("Notice of Note Conversion").

126. Around June 6, 2024, the Santarelli, Fossum, Johnson, and the Norada Enterprise Defendants failed to disclose, or caused Norada Capital to fail to disclose material information, including, but not limited to, the strong possibility of Norada Capital's default on the Notes and serious consideration of pausing all distributions to investors and converting the notes to equity. This is despite Santarelli admitting in an e-mail dated June 25, 2024, that Norada Capital, were "monitoring this trend for a number of months but our distributions would not scale up fast/soon enough to service our Notes as originally forecasted." (emphasis added)

127. The omissions, lies and half-truths generated and caused to be made by the Defendants while they were associated with the Norada Enterprise continued

unabated. Investors were in July 2024 informed *carte blanche* that they were now allegedly invested as equity shareholders in Norada Capital. In one communication to investors, including but not limited to the Texas Norada Plaintiffs, Defendants promised or caused to promise to investors in the Notes that "You now stand to benefit from any future gains in company and share value and any distributions paid to shareholders as determined by management." *See* ***Exhibit "4"*** annexed hereto and incorporated by reference to this Complaint ("July 8, 2024 update to investors."). Defendants knew or had reason to know that there were no such gains or distributions that would or could ever inure to the benefit of holders of the Notes, and thus this statement was false and misleading and intended to lull investors such as the Texas Norada Plaintiffs into inaction to protect their interests.

128. Defendants also knew or had reason to know that such benefits would not be forthcoming because a significant amount of investors' funds were never invested at all but instead personally squandered by Santarelli or used to facilitate conveyances of virtually worthless assets that the Norada Enterprise under Fossum's watch as CFO could mark-up to feign holding assets of value.

129. At this time, it was also confirmed that due to the purported conversion, there would no longer be "continued interest payments. You are a shareholder and benefit from potential future gains in share value, cash distributions, and redemptions from liquidity distribution events." *Id.*

130. At this time, it was also stated that the decision to suspend payments was a result of "thorough deliberation and analysis of market conditions, the cash distribution position of our investments, and our current financial position[.]"

131. Further, investor such as the Texas Norada Plaintiffs were told that "market conditions" meant "tight capital markets, slower-than-expected revenue growth with our portfolio businesses, and the overall cash position and distribution schedules of our portfolio businesses" and that financial reports for the Notes would be provided in the coming weeks to determine company and share value. *Id.*

132. At this time, Defendants also elaborated upon a half-baked plan to "redeem investor's shares as soon as it becomes financially feasible." The July 8, 2024, e-mail stated that "[r]edemption is the repurchase of your equity as determined by the company. It is not something the investor can choose to do at their option. It is also not based on the Promissory Note maturity date prior to the conversion to equity." *Id.*

133. At this time, as to the liquidity of the shares, the July 8, 2024, also stated "[s]hares are not liquid. They can be redeemed by the company at any time or sold privately to another investor with the approval of Norada Capital." *Id.*

134. Authorized by his fellow Defendants and others involved in the Norada Enterprise, Santarelli, sent investors another e-mail update on July 29, 2024, in which he confirmed that Norada Capital "in its sole discretion" in fact made the conversion of the Notes to equity.

135. The update confirmed "Equity is not liquid or assignable" and "equity investors are not vested with voting or management authority." *See* ***Exhibit "5"*** annexed hereto and incorporated by reference to this Complaint ("July 29, 2024 update to investors").

136. In a Q&A section of this message, when asked if the "family" that comprised the Norada Enterprise was going bankrupt, Santarelli responded that "No, it is not. After careful consideration and analysis, we implemented these changes to ensure our business's long-term stability and sustainability, benefitting all our investors." *Id.*

137. With the review and approval of his fellow Defendants and other Norada Entities, Santarelli issued another e-mail update on August 12, 2024 specific to the e-commerce business assets of Norada Capital. *See* ***Exhibit "6"*** annexed hereto and incorporated by reference to this Complaint ("August 12, 2024 e-mail update"). Santarelli communicated that the financial instruments of the e-commerce businesses were restricted and had been placed into an "almost entirely debt-free

holding company" called "Omni." In this letter, Santarelli stated Norada Capital invested $12,250,000.00 into "various e-commerce-based investments" and that "Norada Capital owns 11.1193% of Omni's equity today."

138. This statement lacked factual support and was materially misleading. There was no and has never been disclosure to anyone as to who manages "Omni," where any of the parties to the Norada Enterprise sit in its capital stack (if at all), and why any of them are even invested in it. Further, the Defendants knew or should have known by August 2024 that the Notes were placed in violation of the Regulation D exemption previously claimed, and thus any holding of unregistered, "restricted" financial instruments could not be held indirectly or beneficially by any unaccredited investors. Defendants at this time knew or had reason to know that there were in fact unaccredited investors in the Notes that rendered the Regulation D exemption useless, thereby invalidating any claimed exemption and rendering the offering unlawful.

139. To the extent funds were invested at all, the Texas Norada Plaintiffs are informed and believe that few, if any of the financial instruments invested in via the Ponzi scheme of the Notes were registered with the SEC or Texas's securities authorities. Further, the control positions of the Individual Defendants within component companies created irreconcilable conflicts of interest a. Defendants caused Norada Capital to fail to comply with the prohibitions of solicitation of investments from unaccredited investors and failed to comply themselves, which included public advertising and a publicly accessible website.

140. Defendants utilized instrumentalities of interstate commerce in connection with unlawful placements and sales of unregistered securities in the form of the Notes.

141. In connection with the foregoing, Defendants made or caused material misrepresentations and omissions to the Texas Norada Plaintiffs and failed to disclose, or caused to fail to disclose, material facts upon which a reasonable investor

would rely, including but not limited to disclosures regarding (a) the risk level of the Notes as unsuitable for any investor, (b) each Plaintiff's lack of suitability for such investments, (c) the common control of Santarelli, Fossum and Johnson over the Norada Entities, (d) the lack of internal controls among the Norada Entities, (e) the misuse of funds intended for the Notes,(f) the inability of Norada Capital to claim a safe harbor under Regulation D due to its own misconduct and its association with "bad actors," and (g) the accuracy of financial information regarding component companies in the Norada Entities that were underlying the Notes.

142. The Texas Norada Plaintiffs are also informed and believe that each of the Defendants affirmatively knew those material misrepresentations and omissions were false and misleading when made or failed to be made, and knew that the Texas Norada Plaintiffs and others did not realize the risky and highly speculative nature of the investments doomed any reasonable prospects to ever get their money back.

143. Had Defendants even offered a scintilla of truth as to the financial condition of their Ponzi scheme or warned the Texas Norada Plaintiffs as to the true state of the Norada enterprise, none of the Texas Norada Plaintiffs would have purchased or continued holding the Notes.

144. Even after the conversion of the Notes into equity, Santarelli brazenly continued to market promissory notes in Aspire Events, LLC to the Texas Norada Plaintiffs and other investors in the Notes. On information and belief, Santarelli marketed this security because he owed Aspire Events, LLC money for broken past promises of investments that never arrived.

145. In such cases, Santarelli promised 17% interest and quarterly interest payments, stating the company had roughly 1,900 paying members with a current valuation of $43 million.

146. On information and belief, the Texas Norada Plaintiffs assert that Aspire Events, LLC, could not pay any investors 17% interest and that its valuation of $43 million was, is, and continues to be a sham.

147. Undaunted, on November 13, 2024, Defendants caused Norada Real Estate to send flyers for investment opportunities for a "protected return of 23%" in the Turquoise Bay Resort in Englewood, Florida to investors in the Notes. Under the control of the Individual Defendants, Norada Real Estate apparently conducted this sale campaign in a last-ditch effort to keep the Norada Enterprise going. *See* ***Exhibit "7"*** (Turquoise Bay Promotion E-mail). Despite a small disclaimer at the bottom of the e-mail saying that this was only an offer from Aspire Events, LLC, the promotional e-mail was sent from a Norada Real Estate e-mail address. *Id*.

148. By the end of November 2024, virtually all communications regarding the Notes and equity of the Norada Enterprise to the Texas Norada Plaintiffs and other investors had ceased.

149. On January 23, 2026, a consent judgment ("SEC Consent Judgment"), *annexed* hereto as ***Exhibit "8"*** was filed in *SEC v. Santarelli*, Crim. No. 8:25-cv-002375-FWD-ADS (C.D. Cal) at Docket 1, ordering, among other things, that "Defendant shall pay disgorgement and ill-gotten gain, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

150. Moreover, Santarelli is precluded from arguing that he did not violate the securities laws as alleged in the Complaint ("SEC Complaint"), to wit: Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77f, and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, in connection with the SEC's motion for disgorgement and/or civil penalties at any hearing help on such a motion. In addition, the Consent Judgment permanently restrains and enjoins Santarelli from violating several sections of the Securities Exchange Act of 1934 and the Securities Act of 1933. See ***Exhibit "8", supra.***

151. On or about September 8, 2025, in *United States vs. Santarelli*, 8:25-cr-00174-FWS-1 (C.D. Cal)., Santarelli was charged with one count of Wire Fraud

substantially related to the allegations in this Complaint. On October 20, 2025, pursuant to a sealed plea agreement, Santarelli pled guilty to this charge. See Docket 8 and Docket 15. The criminal information filed in this matter is annexed hereto as ***Exhibit "9."***

## ANY SAFE HARBOR PROVISIONS FOR FORWARD-LOOKING STATEMENTS ARE INAPPLICABLE

152. Any statutory safe harbor for forward-looking statements under state and federal securities laws does not apply to Defendants with regard to the Notes. First, the representations made or caused to be made by those assisting or acting on behalf of the Norada Enterprise with respect to the risks of the Notes were not forward-looking statements when they were made or offered to the Texas Norada Plaintiffs, but instead statements made in furtherance of an overall fraud.

153. To the extent that any such statements were forward-looking statements, other than meaningless "boilerplate," there were no meaningful "cautionary statements" or disclosures identifying important factors that could cause actual results from each of the component investments held by the Norada Entities for the Norada Capital portfolio to differ materially from those in the forward-looking statements. Further, the safe harbor does not protect against material omissions, in light of the Defendants' violations and aiding of violations of Regulation D.

## FIRST CAUSE OF ACTION
## VIOLATION OF SECTION 10(B)
## OF THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5
## (Against All Defendants)

154. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

155. Plaintiffs plead these federal securities claims in the alternative to the extent this Court determines such claims are properly adjudicated in this District rather than in Wyoming.

156. At all relevant times while associated with the Norada Enterprise, Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce: (a) employed or caused to employ devices, schemes, and artifices to defraud; (b) made or caused to make untrue statements of material fact and omitted material facts necessary to make the statements made not misleading; and (c) engaged or caused others to engage in acts, practices, and courses of business which operated as a fraud and deceit upon the Texas Norada Plaintiffs.

157. Each of the Defendants acted knowingly or, at minimum, with severe recklessness.

158. In this regard, at all relevant times while associated with the Norada Enterprise, Defendants (a) made or caused to make material misrepresentations regarding the risk of the Notes and/or failed to disclose the risk of the investments supporting the Notes, and thus the Notes; (b) knew or had reason to know that the underlying investments of the Notes, and thus the Notes, were risky and highly speculative when the statements and/or omissions were made upon which a reasonable investor would rely; (c) failed or caused others to fail to disclose conflicts of interest in ownership and control by Santarelli and Fossum among the Norada Entities, (d) engaged or caused others to engage in the aforementioned acts in connection with the placement and sale of unregistered securities; (e) knew that each of the Texas Norada Plaintiffs reasonably would rely or relied on these material misrepresentations and/or omissions in connection with their decisions to purchase or hold financial interests in the Notes; (f) knew that the Texas Norada Plaintiffs' reliance led to the loss of substantial sums of their respective investments; and (g) knew that Defendants' misrepresentations and omissions were made with requisite scienter and intended to and did induce the Texas Norada Plaintiffs' reliance with the intent to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

159. At all relevant times, each of the Defendants failed or caused others to

fail to disclose material facts to the Texas Norada Plaintiffs and acted with requisite scienter with such disclosure failures, including but not limited to (a) concealment of Fossum's status as a "bad actor," (b) concealment that Santarelli was a failure as an investment professional and in fact previously filed for bankruptcy; (c) concealment that Santarelli was previously ordered to cease and desist from offering nonexempt, unregistered offerings of securities due to illegally soliciting an unaccredited investor and failing to disclose his bankruptcy; and (d) concealment Santarelli's company 360 Enterprises d/b/a Norada Real Estate previously filed for bankruptcy, all of which Defendants knew or had reason to know of and knew or had reason to know the facts of which would be material to investors in the Notes, including but not limited to the Texas Norada Plaintiffs.

160. Defendants also made or caused others to make material misrepresentations and/or omissions regarding how much revenue Norada Capital's underlying investments were generating because stating otherwise would have revealed that the Notes were unsuitable for anyone. Also undisclosed or caused to be undisclosed by Defendants was the insufficient capitalization of those component companies of the Notes and thus the Notes to generate any return, along with the lack of any reasonable factual bases for Santarelli's "track record," the outsized returns and "bonus" promised to investors in the Notes.

161. Further, each of the Defendants knew or had reason to know that Norada Capital was acting as an unregistered broker-dealer and investment adviser when federal securities laws required its registration as such. But at every turn and in every communication with the Texas Norada Plaintiffs, these Defendants stood by and did nothing as each of them was a crucial component of the Norada Enterprise.

162. Defendants also intentionally failed to disclose, or caused failures to disclose that Norada Capital's operations were being conducted in violation of state and federal securities laws given that Norada Capital should have been registered as

a broker-dealer or investment adviser to conduct its business, but it was not.

163. Each of the Defendants acted with scienter as to these failures because had they actually undertaken the disclosures they were supposed to make, the Norada Enterprise that benefited each of them could never have garnered funds from unsuspecting investors. Defendants' nondisclosures and efforts towards nondisclosures by others were necessary to maintain investor confidence and continue raising capital.

164. The allegations of this complaint collectively establish that each of the Defendants acted with scienter as they: (a) had direct access to internal financial data demonstrating cash-flow deficits; (b) controlled or had the capacity to control intercompany transfers and the commingling of funds; (c) continued soliciting new investments while internally monitoring insufficient distributions; (d) certified or caused to certify regulatory filings despite knowledge of disqualifying events and failed to update them; and (e) each personally benefitted from the continuation of the illegal placement of the Notes through compensation, control, and access to investor proceeds.

165. This in addition to the SEC and Criminal complaints against Santarelli establishing such scienter and other elements of this claim.

166. Through these and other misstatements and omissions, each of the Defendants while associated with the Norada Enterprise directly and indirectly, through the instrumentalities of interstate commerce, engaged or caused others to engage in a continuous course of facilitating, causing and making misrepresentations and omissions regarding the Notes for the purpose of deceiving and misleading investors such as the Texas Norada Plaintiff. Included in these misrepresentations were misstatements as to reliance on Regulation D as an exemption from registration when that exemption could not be invoked.

167. Each of the Defendants while associated with the Norada Enterprise failed to disclose or caused failures to disclose that the Notes and the investments

supposedly supporting them were merely the pretext for the operation of the Norada Enterprise.

168. The misuse of investors' funds intended for the Notes occurred while the Defendants stood in silence and failed to disclose such conduct to the Texas Norada Plaintiffs or warn them.

169. At the time of these misrepresentations and key omissions, the Texas Norada Plaintiffs were ignorant of the riskiness and speculative nature—if not the inherent worthlessness—of the investments that each of the Defendants were handling yet misrepresented to induce purchases and continued holding of the Notes.

170. Had the Texas Norada Plaintiffs known about the extreme risks involved, Santarelli's previous cease and desist orders and prior bankruptcy filings, Fossum's status as a "bad actor," and/or that Santarelli was running the Norada Enterprise as a Ponzi scheme, each one of the Texas Norada Plaintiffs would have never invested in the Notes as unregistered securities.

171. The Texas Norada Plaintiffs further aver that the conduct of Neach of the Defendants while associated with the Norada Enterprise was so blatantly reckless as to misstatements and omissions to investors in the Notes that this Court may infer they each acted with scienter as a matter of law. The foregoing allegations give rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent.

172. Based on the foregoing, each of the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As a direct and proximate result of the wrongful conduct, the Texas Norada Plaintiffs suffered damages in an amount to be proven at trial, but no less than Plaintiffs invested principal $950,000 (NINE HUNDRED FIFTY THOUSAND DOLLARS), plus lost promised interest, and related consequential damages.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
## (Against All Defendants)

173. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

174. This cause of action is pled in the alternative to the extent permitted by law.

175. Each of the Defendants while associated with the Norada Enterprise were controlling persons within the meaning of Section 20(a) of the Exchange Act of Norada Capital, by virtue of their positions, authority, influence, participation in management of and direct involvement in the Notes offering and corresponding investor communications.

176. Each of the Defendants individually had the power to control or influence the transactions or business conduct giving rise to the securities violations as alleged herein and exercised the same.

177. Each Defendant had the power to prevent or correct the primary violations alleged herein and failed to do so.

178. As set forth above, Defendants committed primary violations of Section 10(b) and Rule 10b-5 by the acts and omissions alleged herein. By virtue of their control positions of entities intimately entwined in the Norada Enterprise, Defendants are each liable for the Texas Norada Plaintiffs' losses in the Notes pursuant to Section 20(a) of the Exchange Act.

179. Among other things, Defendants each had the power and authority to control the editing, distribution and content of marketing materials, investor decks, webinars, the use of proceeds, intercompany transfers, and the decision to suspend payments and impose the forced conversion.

180. Among other things, the Individual Defendants had the power and authority to control or materially influence financial reporting, investor payment

administration, internal accounting, and the communication of financial condition to investors.

181. Among other things, Johnson had the power and authority to control or materially influence solicitation practices, investor-facing communications through the "boiler room" he managed, and the continuation of the sales program through his role as Senior Investment Counselor, including through direct investor contact and receipt of transaction compensation. Johnson further maintained control to allocate investments intended for the Notes through NFM.

182. By reason of the foregoing, each of the Defendants are jointly and severally liable with Norada Capital for the primary violations alleged herein to the fullest extent permitted by law.

**THIRD CAUSE OF ACTION**
**CALIFORNIA CORPORATIONS CODE § 25401**
**(Against All Defendants)**

183. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

184. This cause of action is pled in the alternative to the extent permitted by law.

185. In connection with the offer and sale of the Notes in California and into California-controlled operations, Defendants while associated with the Norada Enterprise offered and sold securities, or caused the offer or sale of securities by means of written and oral communications that included untrue statements of material fact and omitted material facts necessary to make the statements made not misleading.

186. The Notes constitute "securities" under California law.

187. The misrepresentations and omissions made or caused by Defendants included those described above, each of which was material.

188. Plaintiffs did not know of the untruths or omissions and, in the exercise of reasonable diligence, could not have known the truth given Defendants'

concealment and control of information.

189. Defendants are each liable under California Corporations Code §§ 25401 and related remedies provisions.

**FOURTH CAUSE OF ACTION**
**CALIFORNIA CORPORATIONS CODE § 25501**
**(Civil Liability for § 25401 Violations)**
**(Against All Defendants)**

190. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

191. This cause of action is pled in the alternative to the extent permitted by law.

192. While associated with the Norada Enterprise, each of the Defendants sold or caused the sale of the Notes to Plaintiffs by means of misrepresentations and omissions within the meaning of § 25401.

193. Plaintiffs are entitled to rescission or damages under § 25501, including consideration paid, interest thereon, and attorneys' fees and costs where authorized.

**FIFTH CAUSE OF ACTION**
**CALIFORNIA CORPORATIONS CODE § 25504**
**(Control Person Liability Against All Defendants)**

194. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

195. To the extent required, this cause of action is expressly pled in the alternative.

196. While associated with the Norada Enterprise, each Defendant directly or indirectly controlled persons liable under § 25501 and/or § 25504.1 and are therefore jointly and severally liable unless they establish the statutory defense of lack of knowledge and reasonable care.

197. None of the Defendants can meet the burdens of that defense because they each had actual knowledge of, participated in, caused and/or recklessly disregarded the illegality and frauds alleged herein.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF TEXAS SECURITIES LAWS**
**(Against All Defendants)**

198. All preceding paragraphs of the Complaint are restated by the Texas Norada Plaintiffs as if set forth fully herein.

199. To the extent required, this cause of action is expressly pled in the alternative.

200. Under the Texas Securities Act, Tex. Gov't Code § 4008.052(a)(2), a person is liable to a buyer of a security if the person offers or sells the security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

201. The Notes constitute "securities" within the meaning of the Texas Securities Act. No Defendant against whom this claim is asserted can claim the benefit of any exemption or safe harbor for the offering of the Notes because: (a) Fossum was a "bad actor"; (b) the offering of the Notes was conducted in violation of Regulation D and therefore in violation of the securities laws of the State of Texas; and (c) Norada Capital was acting as an unregistered broker-dealer and investment adviser in the State of Texas when registration was required.

202. Defendant Norada Capital offered and sold Notes to the Texas Norada Plaintiffs by means, directly or indirectly, of: (a) untrue statements of material fact; and/or (b) omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

203. Specifically, Norada Capital: (a) Failed to disclose that it was inadequately capitalized to achieve the repayment objectives under the Notes and was generating insufficient revenue to continue operating; (b) Failed to disclose Santarelli's compulsive spending fueled by investor funds; (c) Failed to disclose Santarelli's prior bankruptcy filings individually and on behalf of 360 Enterprises

d/b/a Norada Real Estate; (d) Failed to disclose Fossum's status as a "Bad Actor"; (e) Failed to disclose Santarelli's prior cease-and-desist orders relating to improper securities offerings; and (f) Failed to disclose the commingling of investor funds and Ponzi-like use of proceeds.

204. These misrepresentations and omissions were material because a reasonable investor would have considered the omitted information important in deciding whether to invest in unsecured promissory notes issued by Norada Capital.

205. Norada Capital knew, or in the exercise of reasonable care should have known, that the statements were false and that material information had been omitted. Norada Capital had access to its own financial records, capitalization data, bank records, and internal corporate documents and knew its true financial condition.

206. Norada Capital made these misrepresentations and omissions with the intent that the Texas Norada Plaintiffs would invest in the Notes and/or had reason to expect that the Texas Norada Plaintiffs would rely upon them.

207. The Texas Norada Plaintiffs were justified in relying upon these misrepresentations and omissions.

208. As a direct and proximate result of Norada Capital's violations of the Texas Securities Act, the Texas Norada Plaintiffs suffered damages of at least $950,000, exclusive of statutory interest, costs, and attorneys' fees.

209. While Plaintiffs have not waived protections under the securities laws of their home state and Defendants cannot waive compliance with such laws, Plaintiffs assert these same claims under parallel provisions of the laws of the State of Wyoming, which is the choice-of-law designated in the Notes to govern certain contractual matters, to the extent it controls, if at all.

210. Pursuant to Tex. Gov't Code § 4008.052(b), the Texas Norada Plaintiffs are entitled to rescission or damages, together with interest at the statutory rate, court costs, and reasonable attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**CONTROL PERSON AND PARTICIPATION LIABILITY UNDER THE TEXAS SECURITIES ACT**
**(Against All Defendants)**

211. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

212. This cause of action is pled in the alternative to the extent permitted by law.

213. Tex. Gov't Code § 4008.055(a) provides that a person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Sections 4008.051, 4008.052, 4008.053, or 4008.054 jointly and severally with the seller, buyer, or issuer and to the same extent as the seller, buyer, or issuer.

214. The Defendants are liable under Tex. Gov't Code § 4008.052 for offering and selling securities by means of untrue statements of material fact and omissions of material facts necessary to make the statements made not misleading.

215. The Defendants directly or indirectly controlled Norada Capital and the Norada Entities within the meaning of Tex. Gov't Code § 4008.055(a), exercised the power to direct their management and policies, and had authority over the offering materials, investor communications, capitalization decisions, and the handling and disposition of investor funds.

216. Pursuant to Tex. Gov't Code § 4008.055(c), a person who directly or indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law, materially aids a seller, buyer, or issuer of a security is jointly and severally liable with and to the same extent as the seller, buyer, or issuer.

217. The Defendants materially aided the sale of the Notes to the Texas Norada Plaintiff by, among other things: (a) Preparing or approving offering materials; (b) Directing investor communications and marketing efforts; (c) Supervising fundraising activities; (d) Controlling corporate bank accounts and inter-entity transfers; and (e) Permitting or directing the commingling and diversion

of investor funds.

218. The Defendants acted with intent to deceive or defraud, or with reckless disregard for the truth or the law, in materially aiding the unlawful sales described herein.

219. The Defendants cannot sustain the burden of proof under Tex. Gov't Code § 4008.055(b) that they did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.

220. Pursuant to Tex. Gov't Code § 4008.055(d), there is contribution as in cases of contract among the several persons who are liable.

221. While Plaintiffs have not waived protections under the securities laws of their home state and Defendants cannot waive compliance with such laws, Plaintiffs assert these same claims under parallel provisions of the laws of the State of Wyoming, which is the choice-of-law designated in the Notes to govern certain contractual matters, to the extent it controls, if at all.

222. Accordingly, pursuant to Tex. Gov't Code § 4008.055(a) and (c), the Defendants are jointly and severally liable with the Defendants to the Texas Norada Plaintiff for rescission or damages, together with statutory interest, costs, and reasonable attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**FRAUD**
**(Against All Defendants)**

223. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

224. To the extent required, this cause of action is expressly pled in the alternative.

225. While associated with the Norada Enterprise, each of the Defendants made or cased others to make material representations of fact, and concealed and caused others to conceal material facts, as described above, all with knowledge of

their falsity or with reckless disregard for the truth.

226. While associated with the Norada Enterprise, each of the Defendants intended for the Texas Norada Plaintiffs to rely on these representations and omissions to invest, reinvest, and refrain from demanding repayment.

227. The Texas Norada Plaintiffs reasonably relied upon the misrepresentations and omissions and were damaged as alleged. Reliance by the Texas Norada Plaintiffs was reasonable given Defendants' control of material financial information and affirmative representations of regulatory compliance and financial stability.

228. The conduct of each Defendant was willful, malicious, and oppressive, entitling Plaintiffs to punitive damages.

**NINTH CAUSE OF ACTION**
**UNFAIR COMPETITION (BUS. & PROF. CODE § 17200)**
**(Against All Defendants)**

229. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

230. To the extent required, this cause of action is expressly pled in the alternative.

231. While associated with the Norada Enterprise, each of the Defendants engaged or caused others to engage in unlawful, unfair, and fraudulent business practices by marketing and selling unlawful securities, making misrepresentations and omissions, and engaging in a course of conduct that deceived investors in violation of California law.

232. Plaintiffs seek restitution, disgorgement, and injunctive relief as permitted.

**TENTH CAUSE OF ACTION**
**FRAUDULENT TRANSFER**
**(Cal. Civ. Code § 3439.04(a)(1))**
**(Against All Defendants)**

233. The Texas Norada Plaintiffs incorporate by reference all preceding

paragraphs of the Complaint as if set forth fully herein.

234. At all relevant times, the Defendants, as well as and the affiliated Norada Entities were indebted to Plaintiffs as creditors by virtue of the Notes.

235. Plaintiffs are "creditors" within the meaning of California Civil Code § 3439.01(c).

236. The Defendants made transfers of property, including investor funds and other assets, to Santarelli, Fossum, Johnson, Norada Fund Management, affiliated entities, and third-party ventures including, but not limited to, Aspire-related entities and Mastermind Businesses.

237. These transfers included, without limitation: (a) Transfers of investor proceeds between Norada Entities without documentation; (b) Payments to insiders; (c) Transfers made for personal expenditures of Santarelli; (d) Transfers made to affiliated ventures that did not provide reasonably equivalent value; (e) Transfers made while investor payment obligations remained outstanding.

238. The transfers were made with actual intent to hinder, delay, or defraud creditors, including Plaintiffs, within the meaning of California Civil Code § 3439.04(a)(1).

239. Badges of fraud evidencing such intent include: (a) The transfers were to insiders; (b) The Defendants retained possession or control of transferred assets; (c) The transfers were concealed or inadequately documented; (d) The transfers were made after the Defendants had incurred substantial obligations to Note holders; (e) The transfers were of substantially all available assets; (f) The Defendants were insolvent or became insolvent shortly after the transfers; (g) The transfers were not made for reasonably equivalent value; (h) The transfers were made in furtherance of a Ponzi-like scheme.

240. Transfers made in furtherance of a Ponzi scheme are presumptively made with actual intent to defraud creditors.

241. At the time of the transfers, the Defendants were insolvent or were

rendered insolvent as a result of such transfers.

242. As a direct and proximate result of these fraudulent transfers, Plaintiffs have been damaged in an amount not less than the unpaid principal and accrued interest owed under the Notes.

243. Pursuant to California Civil Code § 3439.07, Plaintiffs seek avoidance of the transfers, attachment of transferred assets, injunctive relief, imposition of a constructive trust, and recovery of the value of the transferred assets.

**ELEVENTH CAUSE OF ACTION**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**(Cal. Civ. Code § 3439.04(a)(2))**
**(Against All Defendants)**

244. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

245. The Defendants made transfers of investor funds and other property to Santarelli, Fossum, Johnson, Norada Fund Management, affiliated entities, and third-party ventures including, but not limited to, Aspire-related entities and Mastermind Businesses.

246. The transfers were made without receiving reasonably equivalent value in exchange.

247. At the time of the transfers, the Defendants: (a) Were engaged in business for which their remaining assets were unreasonably small in relation to the business; or (b) Intended to incur or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

248. The Norada Enterprise operated at sustained cash-flow deficits and relied upon new investor funds to pay earlier investors.

249. The underlying portfolio companies did not generate sufficient legitimate revenue to satisfy the obligations owed to Plaintiffs.

250. Accordingly, the transfers are voidable under California Civil Code § 3439.04(a)(2).

251. Plaintiffs have suffered damages equal to the unpaid principal and interest due under the Notes.

252. Plaintiffs seek all remedies available under California Civil Code § 3439.07.

**TWELFTH CAUSE OF ACTION**
**CORPORATE WASTE**
**(Against All Defendants)**

253. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

254. At all relevant times, Norada Capital and the affiliated Norada Entities were under the direction and control of Santarelli, Fossum, Johnson, and Norada Fund Management (the "Individual Defendants").

255. As officers, managers, controlling persons, and de facto fiduciaries of the Norada Entities, the Individual Defendants owed fiduciary duties of loyalty, care, and good faith to the entities and, upon insolvency, to creditors including Plaintiffs.

256. At all relevant times, the Norada Enterprise was insolvent or operating within the zone of insolvency.

257. Despite these duties, the Individual Defendants authorized, directed, or permitted the dissipation and diversion of corporate assets for no legitimate corporate purpose.

258. Acts constituting corporate waste include, but are not limited to: (a) Commingling investor funds across entities without documentation; (b) Authorizing transfers for no reasonably equivalent value; (c) Diverting funds to affiliated ventures unrelated to Note obligations; (d) Approving inflated and unsupported asset valuations; (e) Permitting use of corporate funds for Santarelli's personal expenditures; (f) Continuing to incur investor obligations despite known insolvency; (g) Funding speculative ventures incapable of servicing Note obligations; (h) Failing to implement basic internal controls.

259. The transfers and expenditures conferred no benefit upon the Norada

Entities and depleted corporate assets to the detriment of creditors.

260. The challenged transactions were so one-sided that no person of ordinary, sound business judgment could conclude that the corporation received adequate consideration.

261. The waste occurred while the entities were insolvent or rendered insolvent, thereby directly harming creditors including Plaintiffs.

262. As a direct and proximate result of this corporate waste, the Norada Entities were stripped of assets necessary to satisfy obligations owed to Plaintiffs.

263. Plaintiffs have been damaged in an amount not less than the unpaid principal and interest owed under the Notes.

**THIRTEENTH CAUSE OF ACTION**
**AIDING AND ABETTING CORPORATE WASTE**
**(Against Santarelli, Fossum, and Johnson— In the Alternative)**

264. The Texas Norada Plaintiffs incorporate by reference all preceding paragraphs of the Complaint as if set forth fully herein.

265. At all relevant times, one or more of the Individual Defendants committed corporate waste as described above.

266. Each Defendant knew that the Norada Enterprise was insolvent or operating at substantial deficits.

267. Each Defendant knew that corporate funds were being transferred, diverted, or expended without reasonably equivalent value and without legitimate corporate purpose.

268. Despite such knowledge, Defendants substantially assisted and encouraged the waste by: (a) Approving transfers; (b) Facilitating intercompany movements of funds; (c) Preparing or approving misleading financial materials; (d) Concealing insolvency from investors; (e) Continuing to solicit funds while corporate assets were being dissipated; (f) Participating in the forced conversion of debt to illiquid equity.

269. Such substantial assistance was a proximate cause of the dissipation of

corporate assets.

270. The aiding and abetting Defendants acted with actual knowledge or, at minimum, conscious disregard of the wrongful conduct.

271. As a direct and proximate result, Plaintiffs suffered damages in the amount of unpaid principal and interest.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for judgment as follows:

A. Rescission of the Notes and restitution of consideration paid in an amount not less than $950,000 (NINE HUNDRED FIFTY THOUSAND DOLLARS), plus prejudgment interest at the highest rate permitted by law;

B. Compensatory damages in an amount to be proven at trial;

C. Prejudgment interest;

D. Disgorgement and restitution;

E. Treble and punitive damages as provided toy applicable law;

F. Attorneys' fees and costs where authorized by statute; and

G. Such other and further relief as the Court deems just and proper.

Plaintiffs do not seek duplicative recovery and will credit any amounts recovered in the Wyoming Action against any recovery awarded herein to the extent required by law.

Dated: March 24, 2026 **LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

*<u>/s/ Hadjar Anahita Ohadi</u>*
Hadjar Anahita Ohadi
Arthur McDonough
Yilei Huang
*Attorney for the Texas Norada Plaintiffs*